# CASES

### IN THE

# APPELLATE COURTS OF ILLINOIS.

### FIRST DISTRICT—OCTOBER TERM, 1900.

#### DETERMINED DURING THE YEAR 1901.

## Ralph Metcalf, Receiver, etc., v. Arthur W. Draper.

98 399
100 ²236
98 399
115 ³506

1. PROMISSORY NOTES—*Fraud in the Execution of, When a Defense.* —Fraud in the execution of a promissory note, in order to render it a defense against a *bona fide* holder for value, must have been such that the party signing the note was deceived as to the effect of his act.

2. SAME—*Possession, When Evidence of Title.*—Possession of a negotiable note indorsed in blank is *prima facie* evidence of title, and the holder of such instrument is presumed to have taken it in good faith for value, before maturity, in the usual course of business and without notice.

3. SAME—*Innocent Takers Before Maturity and Without Knowledge.*—The party who takes a negotiable promissory note before its maturity for a valuable consideration, without knowledge of any defect of title and in good faith, holds it by a title valid as against all the world.

4. SAME—*Suspicion of Defect in Title Not Sufficient to Defeat It.*— Suspicion of defect of title, or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer of a promissory note, will not defeat his title; such a result can only be produced by bad faith on the part of the taker.

5. SAME—*Burden of Proof on Parties Who Assail a Promissory Note.* —The burden of proof is upon the person who assails the right claimed by another in the possession of a promissory note.

6. SAME—*What Is Not an Obtaining by Fraud and Circumvention.* —Where a promissory note is executed by a party freely and voluntarily, and he well understands what he is doing, it can not be said that such note is obtained by fraud and circumvention.

(399)

7. SAME—*Accommodation Paper Negotiated in Good Faith.*—Accommodation notes, where negotiated in good faith, and for value, in the usual course of business, are binding upon the maker, and he can not, as against such a holder, set up the lack of a consideration as a defense.

8. NOTICE—*To the Officers of a Corporation When Dealing with the Corporation in Their Own Interest, Not Notice to the Corporation.*— Notice to an officer of a corporation is not notice to the corporation in transactions where the officer is dealing with the corporation in his own interest and not in the interest of the corporation.

9. SAME—*Where a Note Appears on Its Face to be Secured by a Trust Deed.*—The fact that a promissory note appears on its face to be secured by a trust deed does not affect its negotiability or require a bank to make inquiry as to whether the statement concerning such security is true.

Assumpsit, on a promissory note. Appeal from the Circuit Court of Cook County; the Hon. EDWARD F. DUNNE, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900. Reversed and remanded. Opinion filed November 26, 1901.

Statement.—On March 4, 1897, Ralph Metcalf, as receiver of the Dime Savings Bank, obtained in the Circuit Court of Cook County against Arthur W. Draper a judgment by confession for $5,850.93, being on one principal note of $4,000 and eight interest coupon notes of $140 each. All of the notes were dated May 1, 1891. The principal note was due five years after date, and the coupon notes were respectively due May 1st and November 1st of each year. The principal note bore on its face the following clauses:

"It is an express condition of this note that in case of default in the payment of the interest, or any part thereof, to accrue thereon when due, as evidenced by said coupons, and for ten days thereafter. the said principal sum of this note shall, at the option of the legal holder thereof, at once become due and payable. The payment of this note is secured by trust deed of even date herewith on real estate in Cook County, Illinois."

The principal note also contained on its face a power to confess judgment in part as follows: "At any time after said note becomes due, either by the option of the legal holder or otherwise, or either of said coupons or any part thereof become due."

Leave was given to the defendant, Arthur W. Draper,

to plead, and on March 22, 1897, an order was entered in said cause, permitting him to file pleas in the suit, which were filed and issue joined thereon.

On May 1, 1891, Arthur W. Draper, the defendant, was a young man twenty-one years and nine months old. He was a clerk in a real estate office, in the employ of a man named Weekly, on commission for such sales as he might make, his salary amounting to about $5 per week. He was in an office at 84 La Salle street, near the corner of Washington street, in Chicago. He had no money, no commercial standing and was financially worthless.

Lyman R. Giddings was a real estate dealer, having an office in the Chamber of Commerce building, on the corner of Washington and La Salle streets, and the Dime Savings Bank was, as its name implies, a savings bank, and was located on Washington street, near Clark street, in Chicago.

Some time in the latter part of April, 1891, a man by the name of Howard asked young Draper whether he would be willing to take title to some property, sign a mortgage for it and reconvey it. As a result, Howard took young Draper to the office of Lyman R. Giddings. Draper testified that Giddings showed to him warranty deeds conveying property to him and told him that "there would be no liability on the notes, as the persons taking the notes would first have recovery on the property and that the property was worth twice the trust deed and notes that I gave on the property. Giddings also showed Draper trust deeds securing the notes, and deeds conveying the property back from Draper to Frank C. Giddings, his brother. He paid Draper $5 for signing $16,000 of such notes, one of which notes for $4,000, and the coupons attached thereto, was the note on which this suit was brought. It was understood between Draper and Lyman R. Giddings that all of the papers were to be put on record simultaneously.

Giddings did not record the warranty deeds nor the trust deeds securing the notes.

Giddings was at this time a director in the Dime Savings Bank, as was also Mr. W. Kelsey Reed, a witness called by

the plaintiff. Mr. Reed had been the treasurer of said savings bank from its organization in 1872, until August, 1893. Prior to May, 1891, Lyman R. Giddings had borrowed of the bank from time to time large sums of money, giving as security therefor notes he held purporting to be secured on real estate.

On June 10, 1891, certain paper, including two of the notes of Arthur W. Draper for $4,000 each, were substituted for paper then so held by the bank and then due. Giddings, at this time, promised to bring in the trust deed by which the notes were secured, but never did so.

The defendant pleaded that the notes were obtained from him by the fraud and circumvention of Giddings; that the plaintiff had notice of this; that there was no consideration for the execution of the notes, and that of this the plaintiff had notice; that the plaintiff did not part with anything of value for the notes.

The jury found the issues for the defendant and there was judgment on the verdict.

WALKER & PAYNE, attorneys for appellant; E. C. LINDLEY, of counsel.

MARSTON, AUGUR & TUTTLE, attorneys for appellee.

MR. JUSTICE WATERMAN delivered the opinion of the court.

Appellee urges that the notes under consideration were put in circulation fraudulently, and that such being the case the burden was upon the plaintiff to show that it took the notes in good faith and for value, in the usual course of business. In support of this contention it calls attention to the Hide and Leather Bank v. Alexander, 184 Ill. 416, same, 82 Ill. App. 484; Hodson v'. Eugene Glass Co., 156 Ill. 397; Charles v. Rennick, 156 Ill. 327; Wright v. Brosseau, 73 Ill. 381; and to Vol. 4 Am. & Eng. Ency. of Law, 2d Ed., 321.

Neither of the cases cited is like the present. In Hide and Leather Bank v. Alexander, Mrs. Alexander, the owner of the note, merely left it with Theodore Schintz in order that he might obtain from Gotfred Schmid a new note in the

place of that left with Schintz. Schintz had neither interest, right nor title to the note, and no authority to do anything except to surrender it upon obtaining from its maker a new note upon its maturity. Schintz fraudulently converted the note to his own use, embezzled it, was guilty in respect to it, under the statutes of this State, of larceny. Such being the facts, the burden of proof was thrown upon the bank receiving it from Schintz to show that it took it in good faith, for value, before maturity, and in the usual course of business.

In the case of Charles v. Rennick the note under consideration was executed in the firm name by one Goldthwaite, for his individual purpose, after he had ceased to be a member of the firm; was a fraudulent transaction as to it. Such being shown, the burden was thrown upon the banker who took the note to show that he received it in good faith, for value, and in the usual course of business.

In the case of Hodson v. Eugene Glass Company it appeared that Fleming, the president of the company, executed to himself its note upon a mere pretense that the company was indebted to him in that sum. Fleming thus having by fraud obtained the company's note, it was held that the holder thereof was bound to show that he acquired it in good faith, for value, in the usual course of business, and in such a way as not to create a presumption of knowledge of its invalidity.

In the case of Wright v. Brosseau, one of the partners of the firm of Brosseau, Martin & Company had fraudulently issued, in the firm name, its note. Such being shown, it was held that an indorsee of the note could not recover thereon, unless he came by the note fairly, without knowledge of the fraud, and paid a consideration for it.

The citation from Vol. 4 Am. & Eng. Ency. of Law is merely as to illegality or fraud in the inception of a negotiable instrument and not as to fraud committed after the maker of the note had, with full knowledge of what he was doing, parted with it.

In the present case the defendant, Draper, testified that

Mr. Howard came to him and asked him if he had any objections to taking the title to a piece of property, and introduced him to Mr. Giddings; that Mr. Giddings told him that the notes were secured by real estate in Holstein; that he intended to build upon some vacant lots there, and being in the mortgage and banking business, he did not desire to make the instruments himself; and that for and in consideration of his signing the notes, Giddings gave him five dollars; that Giddings told him there was no liability on the notes as the person taking the notes would first have recourse on the property and that the property was worth twice the amount of the trust deed and notes that he gave on the property; that a warranty deed of the property was given to him, Draper, and he at the same time executed a warranty deed conveying it back, and also a trust deed securing the notes, and left these deeds with Giddings, who promised to record them; that he, Draper, had been in the real estate business and was familiar with it and knew exactly what he was doing when he signed these notes for Giddings; that he was signing $16,000 worth of what purported to be mortgages on real estate property and was signing $16,000 worth of notes; that Giddings said he did not want to sign them himself; but he probably might want to sell them; that he went to Giddings' office of his own accord and went there to sign these notes, because he was going to get five dollars for signing them; that he was willing to state to the jury that at that time he was willing to sign $16,000 worth of notes and give them to a man whom he had only met two or three times, for five dollars; that the warranty deed conveying the property to him was handed to him and he looked over the description in it and compared it with the description in the trust deed; that he does not know whether he got the property thereto or not, for he handed the deed back to Mr. Giddings, handed it back voluntarily, as the whole transaction was voluntary. "No, it was practically compulsory. There was an understanding that I was compelled to, or I could not get the five dollars, unless I did. It was not voluntary. I got the five dollars; that was all

I wanted to get." That he does not know whether Giddings afterward failed in business or not. "After I got my five dollars, I let him alone. I don't know whether he failed or not." "From the time of this transaction, I had no knowledge of these notes until Mr. Plum mentioned them to me and Mr. Giddings had told him that they had been destroyed." This testimony of the defendant was undisputed and not qualified by any other witness. Indeed, he is the only witness who testified to the circumstances of his execution of the notes.

The testimony of the defendant shows there was no fraud in the inception of the notes; that they were not obtained from him by duress, fraud or circumvention; that so soon as they were taken away by Giddings, they, being each made payable to the order of Draper and by him indorsed, were negotiable instruments, valid, without proof other than their introduction in evidence in the hands of an indorsee thereof, and were not merely alleged notes, as they were described five times in an instruction given by the court at the instance of the defendant.

The fact that Giddings, after Draper had gone away, retaining the notes in his possession, failed to record the various deeds by which they purported to be secured, did not affect the validity of them, nor throw upon the plaintiff the burden of establishing the fact that it took them in the usual course of business, without notice and for value.

Fraud in the execution of a note, in order to render it a defense against a *bona fide* holder for value, must have been such that a party signing was deceived as to the effect of his act. Gehlbach v. Carlinville Nat. Bank, 83 Ill. App. 129; Richelieu Hotel Co. v. Int. Met. Co., 140 Ill. 248.

Possession of a negotiable note indorsed in blank is *prima facie* evidence of title and the holder of such instrument is presumed to have taken it in good faith for value, before maturity, in the usual course of business and without notice. 4th Am. & Eng. Ency. of Law, 2d Ed., 318; 1st Smith's Leading Cases, 780.

The fact that Giddings was a director of the Dime Sav-

ings Bank did not charge it in this transaction had with him, with notice of what he knew concerning the circumstances under which the note was given. Notice to an officer of a corporation is not notice to it in transactions where the officer is dealing with the corporation in his own interest and not in the interest of the corporation. Higgins v. Lansing, 154 Ill. 387; Seaverns v. Presbyterian Hospital, 173 Ill. 420; Waynesville National Bank v. Irons, 8 Fed. Rep. 1.

Nor did the fact that the notes appeared upon their face to be secured by a trust deed affect their negotiability or require the bank to make inquiry as to whether the statement concerning security was true. Olds v. Cummings, 31 Ill. 188; Biegler v. M. L. & T. Co., 62 Ill. App. 560; Howry v. Eppinger, 34 Mich. 29; Buehler v. McCormick, 169 Ill. 269.

It is urged that the conduct of the bank in taking a note without inquiry and its failure to bring suit upon the same as soon as it could, tend to show bad faith upon its part and warranted the jury in finding that it acted in bad faith. The uncontradicted evidence was that at the time it received these notes from Giddings, it had been and was then loaning to him large sums of money, he being in good credit and repute, and it not having then, nor until long after this transaction, lost a dollar by him, he having always protected all paper he gave to it; and that the bank had an agreement with him that he would, as he was accustomed to do, protect all paper he gave to the bank. Under these circumstances, in the usual course of business, it took these notes from him, giving him in exchange certain other notes which he had left with it and which were then about to mature or had just matured. Some of these notes surrendered to Giddings in exchange for these, it appeared upon the trial, were made under circumstances similar to those existing when the notes in question were executed, save that it does not appear whether these notes were or were not actually secured by trust deeds or mortgages on real estate.

As to most of the notes given by the bank to Giddings in exchange for these, according to the bank's register, they were secured upon real estate, were taken by the bank in the usual course of business for value, without notice. The bank gave value for them and the evidence shows that it had reason to and did believe they were valuable assets, the payment of all of which was guaranteed by Giddings. Doubtless, the bank's officers were negligent in not having abstracts of title given to it, showing that all the notes it received from Giddings purporting to be secured by real estate were actually so secured upon property of an adequate value. But this negligence in this regard does not show want of good faith upon its part.

The defendant testified that at the time he executed these notes, he was financially irresponsible. What inducement could there have been for the bank to obtain his unsecured paper, if its officer did not believe, as its cashier testifies, that in dealing with Mr. Giddings they were transacting business with an honest and responsible citizen, whose word they could rely upon and whose conduct had always been that of promptly discharging all his obligations? Moreover, if the officers of the bank were guilty of carelessness or even gross negligence, toward whom were they so negligent?

The defendant, of his own free will, had executed two notes, each for $4,000, and given them to Giddings, with authority to negotiate if he saw fit.

The officers of the bank did, indeed, owe a duty to its depositors who trusted them with their money, but they owed no duty to the defendant whose notes were offered to it, as he had authorized Giddings to do. For the protection of the stockholders and depositors of the bank, its officers, doubtless, should have seen to it that the trust deed purporting to secure these notes was placed upon record, but it did not owe such a duty to the defendant.

The Supreme Court of the United States in the case of Murray v. Lardner, 2 Wall. (U. S.) 110, say of the case of Goodman v. Simonds:

"That case affirms the following proposition: The party who takes it (commercial paper) before due for a valuable consideration, without knowledge of any defect of title, and in good faith, holds it by a title valid against all the world."

"Suspicion of defect of title or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, at the time of the transfer, will not defeat his title. That result can only be produced by bad faith on his part."

"The burden of proof lies on the person who assails the right claimed by the party in possession. Such is the settled law of this court, and we feel no disposition to depart from it."

The Supreme Court of this State in Comstock v. Hannah, 76 Ill. 530, quoting the above, say:

"Such is the settled law of this court and we feel no disposition to depart from it."

To the same effect is Bemis v. Horner, 165 Ill. 347, as well as many other cases.

That the defendant's note went into circulation was not only his own fault, but in accordance with his intention, and for which he received all the consideration he asked or expected. That the deeds by which it purported to be secured were not placed upon record was entirely his fault. They were in his power and he could have recorded them himself, or, as he ought to have done, retained his note until he knew they were recorded and the security sufficient. The only promise to him which Giddings left unfulfilled was his statement that he would record the deeds.

For one year after the execution of the note upon which suit was brought, the interest upon it appears to have been paid. If a man, carelessly, and without consideration, let his note go into circulation and an innocent party purchases it in the usual course of business, upon him must fall the loss, for he it was whose conduct made it possible for the purchaser to be deceived. Leach v. Nichols, 55 Ill. 273.

The jury should not have been instructed as to what they might do upon the hypothesis that the note was obtained by Giddings without his having given the agreed value

Metcalf v. Draper.

therefor, because there was no evidence warranting such hypothesis; on the contrary, the only evidence upon the subject was that Giddings did give all that he agreed to for the note and all that he was asked to give. Nor should the jury have been instructed as to what they might do upon the hypothesis that the notes were obtained from Draper by fraud and circumvention, because there was no evidence tending to show that the notes were obtained from the defendant by fraud and circumvention. On the contrary, the defendant testified that they were executed by him freely, voluntarily, and that he well understood what he was doing. Nor should the jury have been instructed as to what follows when a maker of a note shows that it was obtained from him by fraud, because there was no evidence that the note was obtained from Draper by fraud. On the contrary, he testified that he gave the note to Giddings just as Giddings asked, and as he, the defendant, agreed to do, for five dollars paid to him.

As we have before stated, the only complaint he makes as to the conduct of Giddings is as to Gidding's failure to record the deeds purporting to secure the note, after he, the defendant, had given the notes to Giddings and authorized him to negotiate the same. Nor should the jury have been instructed, as they were by the fourth instruction, that when the maker of a note shows that it was obtained from him by fraud, the burden of proof is upon the plaintiff to show by a preponderance of the evidence that he acquired the notes in question in good faith, for value, and in the usual course of business, and in such a way as not to create a presumption of knowledge of their infirmities.

Nor is it the case, as the jury were told in the fifth instruction, that the want of a consideration destroys the validity of a note in the hands of any one chargeable with notice of such want of consideration, and this without regard to the good faith of the transaction in which the note was given.

The giving of mere accommodation notes is a common occurrence. Such notes, if negotiated in good faith, for

value, in the usual course of business, are binding upon the maker, and he can not, against such a holder, set up the lack of consideration. Daniel on Negotiable Instruments, sections 189, 190.

In the present case, the note was given for a good and valid consideration, small and inadequate as it was.

The judgment of the Circuit Court is reversed and the cause remanded.